Jerry B. CLAYTON, individually and as Trustee for Jerre Clayton Hubbard and Barbara Clayton Anderson, and Barbara Clayton Anderson and Jerre Clayton Hubbard, Plaintiffs,

v.

The ATLANTIC REFINING COMPANY, a corporation, Defendant.

Civ. No. 3363.

United States District Court
D. New Mexico.
April 10, 1957.

---

C. R. Brice, Schauer & Stiff, Roswell, N. M., for plaintiffs.

Hervey, Dow & Hinkle, Roswell, N. M., for defendant.

ROGERS, District Judge.

This is an action for cancellation of an oil and gas lease, insofar as it covers a quarter of a section of land for an alleged breach of an implied covenant reasonably and properly and fully to explore, test and develop the leasehold premises.

The lease in question covers 1,280 acres, composed of five separate or non-contiguous tracts in Lea County, New Mexico. It was executed May 14, 1940, between the fee title predecessor of the plaintiffs, as lessor, and defendant's assignor as the lessee. The primary term thereof was for ten years, and as long

thereafter as oil and gas is produced in paying quantities from the lease by the lessee.

All tracts covered by the lease, which will be referred to as the Dickinson Lease, with the exception of the tract here in suit, which is the NW¼ of S. 26, T. 15 S., R. 37 E., N.M.P.M., and possibly one other tract, are within the Denton Pool, approximately 20 miles Northeast of Lovington, New Mexico. The lands covered by the lease, other than the above specified quarter section, are in Sections 34 and 35, Township 14 South, Range 37 East, and in Sections 1, 13 and 24, Township 15 South, Range 37 East. The discovery well in this pool was completed in 1949 and was 3 miles North of the quarter section here involved. Production in the Denton Field has been obtained in the Wolfcampe Horizon at a depth varying between 9,000 and 10,000 feet, and in the Devonian Horizon at between 12,000 and 13,000 feet. The first well on the leased premises was completed by the defendant in December of 1949, within the lease's primary term, and under the conventional "thereafter" clause referred to above, the remainder of the leased lands were extended, unless it be found that an implied covenant has been broken and that cancellation of the 160 acre tract be required. Between the initial discovery well of December, 1949, on the Dickinson Lease, and the date of filing suit on December 6, 1956, 17 wells were drilled on the premises. Ten of the total of eighteen wells were completed in the Wolfcampe formation, and eight in the Devonian.

A short review of the financial picture here involved is requisite for a decision in this case. The eighteen wells from the inception of the lease to suit time produced a gross revenue of $9,393,525.74. Drilling and development costs, direct operating expenses, lease pro-ration of overhead total the sum of $5,022,145.43. From the net revenue, the operators have received $3,197,189.60, and the owners of the royalty interest the sum of $1,174,190.71.

The Denton Field has been extensively developed, and for the most part, in a Northerly direction. The nearest well on the Southern perimeter of the Field is approximately 1¾ miles North of the Northwest Section of 26. Approximately 1¾ miles to the South of the premises here involved, is the Northernmost producing well in the South Denton Field, a pool apparently much smaller than the Denton Field, and probably less than a square mile in area, according to all the evidence adduced at the trial. All of the oil recovered in the South Denton Field has been yielded by the Devonian Formation, which formation is relatively thin, when compared with the Devonian sands of the Denton Field. While the Wolfcampe Formation has been penetrated in the South Denton Field, it has yielded no oil production.

The geological evidence produced at the trial established a sharp dip as to the Southernmost wells in the Denton Field from the higher wells in the Northern portion thereof. Likewise, the Northernmost wells of the South Denton Field showed a sharp dip from the higher wells in the Southern portion of the South Denton Field. Considerable expert testimony was offered by defendant as to geology in the area covered by the Denton Field, the South Denton Field and the area covered by the lease in controversy. This should be summarized. Detailed composite maps of the area were introduced by stipulation of counsel, which had marked thereon the location, date and ownership of all the wells both producing and non-producing, which have been drilled on the areas in this locality. Contour maps of the Denton Pool, the South Denton Pool and the intervening areas were produced, together with cross sections of the two pools and the intervening area. These exhibits indicated that the Devonian Formation dipped sharply to the South in the Denton Field, and dipped sharply to the North in the South Denton Field; that the two fields are not connected, at least insofar as the Devonian sands are concerned, are

indicated by a difference in water levels in these two pools. At the depth of the Wolfcampe, it might well be that they are in the same pool, but the Wolfcampe is non-productive of oil in the South Denton Pool. All of the technical geological evidence leads the Court to the conclusion that on the basis of presently available geologic information, it would not be reasonable or prudent to drill a well on the quarter section in litigation.

It was further established, however, that additional exploration and geophysical surveys might reveal an anomaly in the area between the two fields, and in the area here in dispute. It would appear that geophysical exploration by way of either seismographic, off-set shootings or pattern testing with concentric receivers are the best methods of obtaining data upon which a sound decision as to the advisability of any drilling operations could be predicated.

A history of geophysical surveys made by defendant on the quarter section in question, and on surrounding areas establishes that in the years 1939 and '40 a reconnaissance type geophysical survey of a large area in Lea County was made which includes the acreage in question, by an organization under contract with the defendant. Following the first discovery well in the Denton Field, defendant's crews spent six months on a similar but more detailed survey which extended to within a mile of the quarter section involved. Defendant, in 1951 and 1952, conducted another geophysical survey in the area. Several lines were shot East and South from the Denton Field, which were corelated with the previous survey made by defendant. Defendant was unable to survey the area here involved because of inability to secure permits from surface owners to do so. As a result, the shot lines stop just to the North of the Northwest Quarter of Section 26. In connection with this survey (the 1951–'52 survey), it should be stated that the method then used by defendant in shooting was what is known as a one

mile "off-set" system, whereby shots are set off a mile away from the seismographic receivers, and the area tested lies half-way between the firing area and the receiving area. In order to continue the shot lines South to include the Northwest quarter of Section 26, it was then necessary that the shots be detonated in areas to the East and West of that quarter section. The lands were owned by the plaintiffs, and the plaintiff Clayton's wife, now deceased, was trustee for minor Dickinson heirs. The Court finds that through the efforts of the plaintiff, Jerry B. Clayton, permission to shoot on the Dickinson land other than land leased to defendant by the 1940 lease, was refused. We thus find that the 1951–'52 survey was curtailed, so far as the Northwest quarter of Section 26 is concerned, by actions of the plaintiffs preventative thereof. Equitable defenses of estoppel, waiver, lack of clean hands or failure to do equity were not affirmatively pleaded by defendant, but the Court is considering these facts, at least as regards the type of Decree to be entered herein. This will be dealt with in more detail later in the opinion.

In 1956, the last survey was commenced by the defendant, beginning in May of that year, and terminating on August 15th. Cessation of the program was due to failure to obtain shooting permits from land owners other than the plaintiffs. It was commenced in the South Denton Field and continued in a Northerly direction. A reflection seismographic survey by test firing was the method used. It was decided by defendant to wait until winter before continuing the survey, because, in the winter-time, the damages would be minimized as to irrigated farms. Before the program was resumed, the instant litigation was filed.

On August 15, 1956, plaintiffs gave notice to the defendant, demanding that the latter drill the tract involved in this suit or release the same from the lease. Suit was filed in District Court of Lea County and removed here on De-

cember 31, 1956, on the ground of diversity of citizenship, and the requisite minimum statutory amount involved.

Before launching into a consideration of the law involved in this case, it should be stated that plaintiffs' witnesses consisted only of the plaintiff, Jerry B. Clayton, whose testimony was nontechnical in nature, an accountant who testified as to the amounts received by the plaintiffs for seismographic shots fired by defendant, and various officials of the defendant company called under Rule 43 of Federal Civil Rules, 28 U.S.C.A. No expert testimony was offered indicating probability of oil in the Northwest quarter of Section 26, nor was there any evidence that any other operator was willing to drill a well on this quarter section.

The respective contentions of the parties may be stated thusly:

(a) Plaintiffs contend that defendant was subject to the obligation and the implied covenant fully to test and explore the tract of land here involved, that it has failed to do so, and the lease should now be cancelled, insofar as it covers the instant tract, unless the defendant commences drilling a well which tests or explores the same within a reasonable time, although the Court now would be justified in cancelling the lease as to such lands.

(b) Defendant takes the position that while defendant has no present plans to drill a well on the quarter section because it has been unable to complete its geophysical work in the area, it still does not consider the area as condemned, and that based on future exploratory activities of a geophysical nature, it is highly possible defendant may drill such well. Defendant advances the legal proposition that the reasonable operator rule announced in Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, is the rule in New Mexico, and precludes plaintiffs' recovery. Alternatively, that even though the rule so announced has been modified by Sauder v. Mid-Continent Petroleum Co., 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255, and cases following

Doss Oil Royalty Co. v. Texas Co., Okl., 137 P.2d 934, plaintiffs still may not recover under the facts in the instant case. Lastly, defendant, in its Brief but not in its pleading, invokes the doctrine of unclean hands, failure to do equity, estoppel and waiver by reason of plaintiffs' refusal in 1952 to permit shooting on plaintiffs' adjoining lands.

The law dealing with the implied covenant to drill additional wells is monumental in volume, and the Federal and State Reports from all oil and gas producing jurisdictions are replete with cases on the question. The first decision touching upon the problem emanating from a State Supreme Court was in the year 1889, and was from the Supreme Court of Pennsylvania. The case was that of Stoddard v. Emery, 128 Pa. 436, 18 A. 339. The pronouncement, insofar as it concerns the implied covenant, was purely dicta, as the case before the Court concerned an express covenant for the development of the property. The Court stated that even if the contract had been silent on the subject, "there would of course have arisen an implication that the property should be developed reasonably, and evidence of a custom of reasonable development by boring a given number of wells in a certain space of time would have been competent, and perhaps controlling."

In 1905, there was announced what has come to be known as the "prudent operator standard" in the case of Brewster v. Lanyon Zinc Co., supra. This was decided by the Court of Appeals of the Eighth Circuit in 1905. It is the landmark case in the field of implied covenants in oil leases, and is universally cited by courts, even though certain decisions giving lip service to the doctrine of the Brewster case sometimes evolve so many exceptions thereto as to vitiate the force of the doctrine. Justice Van Devanter has crystallized the rule in the following language [140 F. 810]:

"The implication necessarily arising from these provisions [of the

lease contract]—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor."

The "ordinarily prudent operator test", is framed thusly by Justice Van Devanter:

"The large expense incident to the work of exploration and development and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. * * * Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

As will be hereinafter discussed, this Court is of the opinion that the rules, as announced in the Brewster case, have been adopted by the Supreme Court of the State of New Mexico, and adopted in their original form, unmodified and unwarped by the subsequent refinements and gradations appearing in decisions from jurisdictions of Oklahoma, Arkansas and Kentucky, and as appearing from decisions of U. S. Courts of Appeal which adopted the state decisions under the doctrine of Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

It might be well in passing, to briefly discuss the growing trend of modification of the Brewster rule. One of the leading state cases is that of Doss Oil Royalty Co. v. Texas Company, supra. This case held, in effect, that to permit the lessee to hold the lease for an unreasonable length of time for speculative purposes, only, is to allow him to protect his own interests and to disregard the interests of the lessor. The Oklahoma Supreme Court then stated that if conditions do not indicate to the lessee that further development will be profitable, it is only fair that after a reasonable time has expired, the lessee surrender the undeveloped portions of the lease and allow the lessor to procure development by others, or assume the burden of showing why the undeveloped portion should not be cancelled, so that the owner may, if possible, get it developed by others. Perhaps the clearest and most succinct summary of the Oklahoma rule appears in the opinion of Judge Wallace, U. S. District Judge, in Blake v. Texas Company, U.S.D.C.Okl., 123 F.Supp. 73, 77 where he states:

"The following is tendered as this Court's best effort to harmonize in resume the implied obligation of the Oklahoma lessee to further develop. (1) Where there is no unusual equity present and the lessee has failed to drill additional wells for so long a period of time that the proof of number of years delay irrebuttably establishes the lessee's lack of diligence, the Court may deem the covenant breached and the lease forfeited without considering evidence on whether further development would have been profitable. (2) Where there is proof of such delay in terms of time, that under the circumstances a prima facie, though not irrebuttable, showing is made of unreasonable delay, the burden then shifts to the lessee to come forward with evidence to establish that although the time of delay appeared unreasonable that he at all times conducted himself

as an ordinary prudent operator and that profitable further development was unlikely. (3) Where the proof of delay in terms of time alone raises no presumption or prima facie case of unreasonable delay, the lessor must establish by a fair preponderance of the evidence that the lessee has failed to measure up to the standard of an ordinary prudent operator in the further development of the lease."

The cases in Arkansas, Kentucky and Kansas, relied on heavily by plaintiffs, appear to lie in that horizon somewhere between the rules and standards of the Brewster case, and the conclusions reached by the Supreme Court of Oklahoma. A most interesting discussion of the evolution and modification of the prudent operator rule may be found in a paper, "Sufficiency of Development of Leased Premises" by Ross L. Malone, Jr., of the New Mexico Bar, delivered at the Deep South Regional Meeting of the American Bar Association at New Orleans, Louisiana, on November 29, 1955. The decisions of the Supreme Court of the State of Texas appear to hew fairly closely to the rules announced in the Brewster decision, and the Court is of the opinion that the Supreme Court of New Mexico would follow the Brewster decision as it has in the past, and would adhere rather closely to the Texas pronouncements.

The first case in New Mexico involving the instant question is that of State ex rel. Shell Petroleum Corp. v. Worden, 44 N.M. 400, 103 P.2d 124, 126, decided in 1940. It was interesting to note that the opinion's author is Charles R. Brice, then a Justice of the New Mexico Supreme Court, and now one of the attorneys for the plaintiffs herein. It was an original mandamus proceeding by the State of New Mexico on the relation of the Shell Petroleum Corp. against Frank Worden, as Commissioner of Public Lands of the State of New Mexico, to require the respondent to accept a rental of $40 tendered him by the relator as advance rental on an assignment of a portion of a certain oil and gas lease, and to otherwise recognize the assignment. The Court, in its opinion, stated among other things, as follows:

"The object of the lessor in making the lease was to secure the development of the leased premises for oil and gas. There is an implied covenant on the part of the lessee (in the absence of any expressed on the subject as in this lease) that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development for production of oil and gas with reasonable diligence as to the undeveloped portion of the leased land. [Citing, among other authority, the Brewster case, supra]."

The Court then states:

"What constitutes reasonable diligence in such cases depends upon the facts of each case."

There were no facts presented to the Supreme Court in the Worden case, and accordingly, no evaluation of them appears. What is significant, however, is that the Court accepted the rules set forth in the Brewster case.

The last statement by the Supreme Court on this question appears in Libby v. De Baca, 51 N.M. 95, 179 P.2d 263, 265. This was an action by the lessor against the lessee to cancel a so-called oil and gas lease, although the same covered carbon dioxide gas, for alleged non-compliance with the implied covenants to diligently develop and operate the lease following the discovery of said gas. After quoting from the Worden case, and specifically from the portion thereof hereinbefore set forth in this opinion, the Court continued:

"But the duty of lessee does not end there. He must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product."

■ This, again, appears to announce the Brewster decision in language similar to that of the original opinion, itself. In the absence of pronouncements to the contrary, this Court will consider that the prudent operator rule is the rule in New Mexico, and the rule which must be applied in this cause.

■ Having concluded that the prudent operator rule, as formulated in the Brewster case, is the law in New Mexico, there now remains the duty of applying the rule to the facts at bar. It devolves into a consideration of what, under all the circumstances of the case, would be reasonably expected of defendant Atlantic Refining Company, as an operator of ordinary prudence having regard to the interests of both the plaintiffs, as lessors, and the defendant, as lessee. The Court is of the opinion that at this time there is no duty on defendant to drill a well on the Northwest quarter of Section 26. The technical evidence demonstrates that the area in question is mid-way between two fields. The contour maps indicate that the Devonian Formations in each field dip sharply toward this quarter section, and cross section exhibits would lead to the conclusion that there is little likelihood of striking oil on this property. The questioned area may well be termed "wildcat". Only in the event of a subsequently discovered anomaly is there a possibility of oil in the tract. On the basis of presently available information, there is nothing to indicate that a well drilled thereon would have a reasonable anticipation of recovery. In view of the drilling costs of such a well, which are in the neighborhood of a half a million dollars, and the present geophysical indications, and bearing in mind the right of the lessors to have the property reasonably developed, defendant cannot be required at this time to drill a well on the premises.

■ Plaintiffs contend that a period of 17 years has intervened without development work having been performed by defendant on the Northwest section of 26. Defendant, on the other hand, contends that the only period to be considered in determining the relative rights and liabilities of the parties hereto, is the period of three years, at the longest, same being from the date of the last producing well of defendant on other portions of the Dickinson Lease, and the time plaintiffs filed suit. The Court concludes that the time element should be computed from a standpoint of the lease as a whole, and that the last well being three years old, that therefore the time involved is three years, and not the seventeen year period, as contended for by the plaintiffs. It is interesting to note, so far as the time interval is concerned, in the Doss Oil case, supra, the time period since the last well drilled was fourteen years, and in the Sauder case, seventeen years.

■ Plaintiffs, in their pleadings and in their brief, seek to predicate their action upon a violation of an implied covenant to explore and test the premises. The Court is of the opinion that the true covenant to be invoked in a case where a discovery well has been drilled and production secured, is the implied covenant to develop. This may be but a play on words, but logic and reason constrains the Court to view the problem as one involving an alleged breach of the implied covenant to develop.

■ As is reflected in the statement of facts appearing in the forepart of this opinion, the defendant was precluded, in 1952, from employing the off-set method of seismographic exploration on the quarter section here involved by the refusal of the plaintiffs to permit firings on lands owned by the plaintiffs on either side of the leased premises. The exact reason for this refusal is rather obscure, but apparently some ill feelings between the plaintiffs and the defendant had been generated even five or six years ago. At any rate, at the suggestion of the plaintiff Jerry B. Clayton, his wife refused permission. This appears to the Court to have been an arbitrary denial of the right of exploration. At that time apparently test firing and the modern technique of reflection seismographic surveys were

not adopted by the defendant and that it was then using the off-set method. This apparently capricious refusal did have the proximate result of terminating the survey. This perhaps would alone have been sufficient ground for denying relief herein to the plaintiffs, and the Court does base its opinion to some extent upon this conduct of the plaintiffs. At the same time, it occurred some five to six years ago, and subsequent geophysical surveys could have been effected by modern technique on the demised premises, themselves, without the off-shoot procedure. Equitable defenses on this state of facts were not raised, as such, in defendant's pleadings, but evidence of the facts were introduced in evidence without objection by the plaintiffs. The Court will at least refrain from including in any Decree, any provisions fixing or attempting to fix any time limits or any provisions prescribing steps to be taken in the future by the defendant as to the quarter section involved. The Decree, however, will be limited to an adjudication of the rights of the parties hereto, as of the present time, and is not to be interpreted as precluding future litigation over the performance of the lessee of its obligations under the lease covering the Northwest quarter of section 26.

The Court will accordingly entertain a Decree holding, in effect, that the failure of the lessee Atlantic Refining Company, to drill a well on the NW quarter of Section 26, during the period of time here involved and under the circumstances shown by the evidence adduced at the trial, is not a ground for cancellation of the lease at the time of the trial. Such Decree is not to be considered as a holding that protracted delay in the future of geophysical surveys and even of a future drilling operation might not ripen into a valid equitable cause of action for cancellation of the Dickinson Lease as it applies to the instant quarter section for a violation of the implied covenant to develop under the prudent operator rule. The Court is holding that a lessor seeking relief by way of cancellation for a breach of the implied covenant to develop has the duty to establish by a preponderance of evidence that the covenant has been breached. The Court here holds that the plaintiffs have failed to establish this burden, and further, that by reason of the facts and circumstances surrounding the course of exploratory efforts heretofore made by the defendant, that the plaintiffs are not entitled to a Decree of any sort, and that defendant is entitled to a Judgment of this Court dismissing plaintiffs' Complaint. The Court is of the opinion that sufficient findings of fact appear in this decision, as do also sufficient conclusions of law. Accordingly, it will entertain a Decree in conformity with this Opinion within ten days from the date hereof.