AMOCO PRODUCTION COMPANY,
Plaintiff-Appellee,

v.

Leland M. JACOBS and Ethel D.
Jacobs, Defendants-Appellants.

No. 83–1281.

United States Court of Appeals,
Tenth Circuit.

Oct. 10, 1984.

William F. Carr, Campbell, Byrd & Black, Santa Fe, N.M. (Harl D. Byrd, Kemp W. Gorthey, Campbell, Byrd & Black, Santa Fe, N.M., and Thomas B. Cuny, Jr., Amoco Production Co. U.S.A., Houston, Tex., with him on briefs), for plaintiff-appellee.

William Monroe Kerr, Jr., Midland, Tex. (Kerr, Fitz-Gerald & Kerr, Midland, Tex., Ernest L. Padilla, Santa Fe, N.M., with him on briefs), for defendants-appellants.

Before HOLLOWAY, DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## INTRODUCTION

This is an oil and gas law unitization case in which the Jacobs, the defendants-appellants here, appeal the district court's declaratory judgment which held valid a certain oil, gas and mineral lease between Amoco, as lessee, and the Jacobs, as lessors.

The Jacobs, husband and wife, are seeking a judicial declaration that a certain oil, gas, and mineral lease between them as lessors, and Amoco Production Company, as lessee, has expired. The Jacobs seek to obtain an order which reverses the order of the district court below. They urge this court to declare that a lengthy unitization agreement which Amoco purports to extend for another period has in law terminated; that some thirteen years have

passed since the original lease was entered into. Their argument is that the judgment of the district court should be reversed because a unitization agreement was ineffective in that it was entered into in bad faith by Amoco. The lease was a ten year one which they say terminated at the expiration of the primary term, thereby entitling the Jacobs to all rights and interest in the subject land. We are unable to adopt the contention.

They also maintain that as a result of the execution of the Jacobs lease Amoco obtained a leasehold or working interest entitling it to the proceeds from the sale of oil, gas and minerals from the leased premises. They also maintain that they reserved to themselves a royalty interest entitling them to one-eighth of the net proceeds at the well of oil and gas sold or one-tenth of the net proceeds at the mine of other minerals.

### SUMMARY OF THE UNIT AGREEMENT AND THE HISTORY OF THE DEVELOPMENT

Paragraph 7 of the pooling or unitization clause of the lease which sets forth these provisions, is appended hereto. The reader will find that this provision broadly provides for the right to unitize, pool or combine all the lands with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by "any governmental authority." There can be modification changes or termination of any such plan or agreement. In such event the terms and conditions of the lease are deemed modified to conform with the terms, conditions and provisions of such approved cooperation or unit plan of development.

A further provision is that this lease shall not terminate or expire during the life of the plan or agreement. In the event that said land or any part thereof shall be operated under any such cooperative or unit plan of development or by the productions allocated to different portions of the land covered by the lease, then the production allocated to any particular tract of land

shall, for the purpose of computing the royalties, be paid hereunder to lessor and it would be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract; and the royalty payments paid thereafter to lessor would be based upon production only as so allocated.

One provision calls for the lessor's consent if there has been governmental approval. It declares: Lessor shall formally express lessor's consent to any cooperative or unit plan of development or operation adopted by lessee and approved by any governmental agency by executing the same upon the request of the lessee.

In early 1977, Amoco commenced efforts to organize the Bravo Dome Carbon Dioxide Gas Unit pursuant to a unitization agreement with other working interest and royalty interest owners in New Mexico. The Bravo Dome Unit is a voluntary one for the exploration and development of carbon dioxide gas from a geologic area known as the Tubb Formation.

The boundaries of the unit embrace approximately 1,035,000 acres of land in Union, Harding, and Quay Counties, New Mexico, including 2,160 acres of the Jacobs' property which had been leased by Amoco starting in 1971; a further part embraces 658,000 acres of fee or patented land leased by private persons or entities including Amoco. Also there is over 295,000 acres of New Mexico State land leased by the Land Commissioner and over 81,000 acres of federal land. Amoco's interest in the unit based on the percentage of acreage included in the unit on which it held a working interest is 74%. Apparently this is the largest unitization agreement that has ever been attempted.

The plan was submitted by Amoco to the New Mexico Commissioner of Public Lands and to the Director of the United States Geologic Survey (hereinafter USGS).

The Lands Commissioner gave preliminary approval of the Unit Agreement as to form and content, but pursuant to state regulations, reserved final approval pend-

ing consideration by the New Mexico Oil Conservation Commission.

On August 14, 1980, after submission of documents and public hearings, the Commission entered Order R–6446, approving the Bravo Dome Unit and Agreement. Final approval was then received from the Lands Commissioner and the USGS.

In October 1980, the Jacobs filed a petition for rehearing. The Oil Commission granted a further public rehearing solely on the issues as to whether the Bravo Dome unitization prevented waste, protected the correlative rights of leaseholders and landowners, and whether the exploratory unitization of the acreage was premature. On January 23, 1981, the Oil Commission in Order R–6446–B again approved the Bravo Dome Unit and Agreement, but imposed additional conditions on the unit operators to insure that operation of the unit would prevent waste and protect correlative rights. The Oil Commission also explicitly retained jurisdiction to require future submission of reports by the unit operators to permit the Oil Commission to consider the future effects of the unitization and to approve future development plans. The New Mexico District Court affirmed the Oil Commission's order and recently it was affirmed again by the New Mexico Supreme Court in *Casados v. Oil Commission*, No. 14,359 (Nov. 10, 1983).

Throughout all of this the Jacobs refused to consent to inclusion in the Bravo Dome Unit and Amoco sought a declaratory judgment in federal court to uphold the lease. The Jacobs never consented to being included in the Bravo Dome Unit. This moved Amoco to seek the declaratory judgment upholding the lease in federal court.

In October 1980, Amoco requested by letter that the Jacobs as lessors and pursuant to paragraph 7, *supra*, of the Lease consent to inclusion of their property in the Bravo Dome Unit by executing a consent form. The Jacobs refused to execute any such consent form and by letter dated September 17, 1981, after expiration of the ten year period of the primary life of the lease, they demanded that Amoco relinquish the Lease inasmuch as they had failed to drill on the leased property during the primary term. Amoco refused claiming that the drilling and production requirements of the Lease were satisfied by drilling on other lands in the Bravo Dome Unit, thus automatically extending the Jacobs Lease into its secondary term.

The Jacobs have refused to accept any tendered lease payments from Amoco. Indeed, the tendered payments to the Jacobs have been returned by them to Amoco. Consequently, during the pendency of the Jacobs' appeals from the New Mexico Oil Commission's approval of the unitization, Amoco filed for declaratory judgment in federal district court in an effort to determine its interest in the Jacobs' property. It sought a ruling that the lease of the Jacobs' property was validly extended beyond its primary term through satisfaction of the Bravo Dome Unit Agreement's drilling and production requirements. The Jacobs counterclaimed for a declaration that the Lease terminated in 1981 at the expiration of the primary term, because of ineffectiveness of the alleged unitization and, therefore, its failure to extend the Lease into its secondary term. The trial judge reached a contrary conclusion.

The district judge tried the case without a jury and found that the unitization agreement was effective and that the lease between Amoco and the Jacobs was still in full force in its secondary term. It is this judgment of the district court that the Jacobs seek to reverse.

Accordingly the lawsuit considered from the Amoco side, seeks to uphold the Unitization Agreement, notwithstanding that it grew out of a ten year lease which had expired. So the main inquiry is did the Unitization Agreement successfully stretch the Jacobs Lease into a secondary term whereby it would be automatically subject to the Unitization Agreement itself. The trial court found and ruled that the approval of the Bravo Dome Unit by the Oil Commission constituted approval by a "governmental authority". The question boils down to whether a "governmental

authority" could by approving the Unitization Agreement bring the Jacobs into the Unitization Agreement itself.

The Jacobs' continuous position is that the Unitization provisions of the Lease were ineffective in extending the lease into its secondary term because Amoco abused its unitization authority contrary to paragraph 7 of the lease. Specifically, the Jacobs' objection is to the drilling by Amoco on property in the Bravo Dome Unit other than theirs. They point out the failure to satisfy the specific drilling and production requirements called for in the Jacobs Lease. The result claimed is that the Jacobs Lease expired by operation of law.

There is no contest with respect to what is contained in paragraph 7 of the Jacobs Lease. It provided for Amoco as lessee to pool or unitize the leased premises with other premises. Notwithstanding this, the Jacobs contend that Amoco abused its authority by committing the Jacobs property to the Bravo Dome Unit under the terms of the Bravo Dome Unit Agreement. They argue that in formulating the Bravo Dome Unit Agreement, Amoco resolved conflicts of interest between itself as lessee-working interest holder and the Jacobs as lessors-royalty interest holders in favor of itself. According to the Jacobs, therefore, unitization of the property was not what constituted the abuse by Amoco. Their objection seems to be based on committing the Lease to this particular unitization agreement. They object to the scope and the extent of the Unitization Agreement and also they object to the fact that their particular lease was extended without their consent. Because of all this, they seek to be severed from the Unitization Agreement.

The Jacobs also argue that Amoco's power to unitize was exercised as agent for the lessors—the class to which the Jacobs belonged. Therefore, it is said that any conflicts between Amoco and the Jacobs should have been resolved by Amoco in favor of the Jacobs as principals. The Jacobs depend on the relationship of lessor and lessee and the failure of Amoco to fulfill its duty as lessor.

## OUTLINE OF THE DEFICIENCIES OF THE UNITIZATION AGREEMENT

The Jacobs here allege that the following provisions of the Bravo Dome Unit Agreement show that Amoco's resolution of that conflict served Amoco's interest and operated to the detriment of the Jacobs:

Paragraph 3.3, explicitly eliminated the implied covenants of the Jacobs Lease;

Paragraph 4.2, which does not have any checks and balances between working interest holders and lessors to manage future development of the unit properties;

Paragraph 6.3, permits "self-dealing" by the working interest holders to set wellhead value and royalty payments to lessors;

Article 5, authorizes production payments on an acreage basis rather than source-of-production basis, thereby benefitting Amoco which controlled 74% of the acreage of the Bravo Dome Unit; and

Article 11, greatly enlarging the working interest holders' rights to use the surface of the lessors' property by permitting the use of each lessor's surface by any and all of the unit operators for operation of the unit. It is said that such enlarged servitude greatly reduces the value of the property to the lessors.

## DISCUSSION OF THE APPLICABLE LAW

The Jacobs argue that the district court erred in finding that these terms did not preclude the unitization agreement from being fair and equitable. The Jacobs assert that comparison of the Bravo Dome Unit Agreement with that in *Phillips Petroleum Co. v. Peterson,* 218 F.2d 926 (10th Cir.1954) illustrates the unfairness of the Bravo Dome Unit Agreement and the breach of duty by Amoco. Therefore, the Jacobs contend that the lease with Amoco expired because the unitization was invalid. They rely on a comparison with this circuit's decision in *Phillips Petroleum Co. v. Peterson,* 218 F.2d 926 (10th Cir.1954). They say that a comparison of this case

with *Peterson* illustrates the unfairness of the Bravo Dome Unit Agreement.

What is the guiding or controlling principle in this matter? The good faith of the oil company is the test which applies generally. At the basis of each of the Jacobs' allegations against Amoco is the premise that in exercising its power to unitize the Jacobs Lease, Amoco owed a strict duty to resolve all conflicts of interest in favor of the Jacobs. The Jacobs contend that the lessor/lessee and royalty interest owner/working interest relationship between Amoco and the Jacobs necessarily implies such an obligation analogous to the obligation concomitant to the principal/agent and beneficiary/fiduciary relationships. This may be the ideal but generally it is not so applied.

■ The Jacobs contend that Amoco should be held to a strict fiduciary standard. Some consideration of the law having to do with this aspect must be considered. This court has stated that the relationship between lessor and lessee regarding the lessee's authority to unitize the lease is "analogous" to that of principal and agent. *Phillips Petroleum Co. v. Peterson*, 218 F.2d 926 (10th Cir.1954). It is true that some courts have described the duty of the lessee to the lessor in terms of a "fiduciary obligation on the part of the lessee." *E.g., McCarter v. Ransom*, 473 S.W.2d 235 (Tex.Civ.App.1971); *Expando Production Company v. Marshall*, 407 S.W.2d 254 (Tex.Civ.App.1966), *reh. denied*. The courts mentioned have recognized that a fiduciary obligation exists in this lessor/lessee relationship. None of them have said that it is a *trustee* situation but there is no indication that this is necessary according to the cited cases. The lessee need not completely ignore its own interest and resolve all apparent conflicts of interest in favor of the lessor. They do

provide that at least some of the lessees interest should be devoted to the lessors.

In *Peterson, supra,* this court recognized the legitimacy of the lessee's interest in furthering the unitization clause in the lease. In interpreting a unitization clause similar to that in the instant case, this court in Peterson ruled:

> [The clause] authorized Phillips [Petroleum Company, the lessee] to unitize the land covered by the leases involved ... and to enter into a contract to effectuate the unit plan of development and operation, so long as Phillips *acted in good faith, fairly, and with due regard for the interests of the lessors, as well as its own interests.* (emphasis added)

*Peterson, supra,* at 935 (emphasis added).[1] It can be argued that the case at bar goes far beyond the standards laid down in the Peterson case. The Peterson case requires that there shall have been due regard by the lessee for the interests of the lessors as well as its own interest and it must have acted in good faith. The position of appellants is that Amoco did not act in the interests of the Jacobs at any time. Thus, although Amoco has drilled throughout the leased area, it has not drilled on the Jacobs land. This fact does not of itself constitute a breach of faith.

The controlling law concerning the validity of a lessee's exercise of its authority to unitize or pool a lessor's property derives principally from the two Tenth Circuit decisions decided in 1954. These are *Phillips Petroleum Co. v. Peterson, supra,* and *Boone v. Kerr-McGee Oil Industries,* 217 F.2d 63 (10th Cir.1954).

In *Boone, supra,* the lessors brought actions against the lessee seeking cancellation of oil and gas leases. Their claim was that the lessee breached its duty to the lessors by pooling the acreage under the leases. The result according to the lessors

---

1. This court through Judge Phillips said at p. 935:

> We are of the opinion that § 12 fully authorized Phillips to unitize the land covered by the leases involved in the instant case and to enter into a contract to effectuate the unit

plan of development and operation, so long as Phillips acted in good faith, fairly, and with a due regard for the interests of the lessors, as well as its own interests, and that § 12 was sufficiently specific to measure the scope of the agent's authority in the premises.

was that such pooling failed to extend the leases and keep them in force. This court held that the test for the validity of unit formation was whether the lessee exercised the unitization authority in "good faith." The court further defined good faith as:

... what is done must be done honestly to effectuate the object and purpose *the parties* had in mind in providing for the exercise of such power.

*Boone, supra,* at 65 (emphasis added).

In holding that the lessee in *Boone* exercised its authority to pool the leases in good faith, this court declared that the law presumes good faith and requires that bad faith must be affirmatively proved. *Id.* This court also stated that bad faith is not sufficiently proved merely by showing that one of the reasons lessee pooled the leases was to extend the duration of the leases into their secondary terms without the wasteful drilling of wells on every lease.

In the *Peterson, supra,* case this court was again confronted with a lessor's alleged abuse of its authority to commit an oil, gas or mineral lease to a unitization development plan as Amoco did here. This court stated that the relationship between the lessor and lessee was "analogous to that of principal and agent" so that the lessee owed the lessor the "duty to exercise a high degree of good faith and loyalty for the furtherance and advancement of the interests of his principal." *Peterson, supra,* at 933–34. The recent decisions from Texas courts reject the argument that the lessee stands in a strict fiduciary relationship. *Murphy v. Amoco Production Company,* 590 F.Supp. 455 (N.D.1984); *Elliott v. Davis,* 553 S.W.2d 223 (Tex.Civ.App. 1977); *Pritchett v. Forest Oil Corp.,* 535 S.W.2d 708 (Tex.Civ.App.1976). The language in Peterson was as follows:

A lessee is bound by implied covenants in the lease to diligently explore and develop the land, and to do so under a *fair unitization plan,* if unitization is effected; ... and in the case of unitization to act *fairly and in good faith with due regard to the lessor's interests,* and to provide for a fair apportionment of the

oil produced. *Id.* at 934 (emphasis added).

The Jacobs claim that this language in *Peterson* supports their contention that the good faith duty owed by Amoco in the exercise of its unitization authority required it to act as their agent and to resolve all conflicts of interest in favor of the principal—here, the Jacobs. The Jacobs also contend that the holder of multiple interests and powers to unitize leases, in exercising each such power, ... in the absence of the joinder of each of his principals, must act as though the holder holds only the power being exercised, and otherwise has no other interests or powers in the subject properties. The agent in such situation is not empowered to act to the detriment of his principals' interests even if *the holder of such power might think that such is for the good of the community at large,* or would benefit others, including itself, who might have other interests [citations omitted].

It is also stated that bad faith is not sufficiently proved by merely showing that one of the reasons lessee pooled the leases was to extend the duration of leases in their secondary terms without the wasteful drilling of wells on every lease. No doubt this was a factor in giving to the lessee some reasonable authority to pool the leases. We do not have that problem here at all. Here we have a major oil company with over one million acres of land in one unitization program picking up a land owner who had leased 2200 acres to it and seeking to satisfy that lessor merely by giving him a dollar an acre every year or to hold the property into the unitization scheme which had been the product of a prior ten year lease. Necessarily when a program of this magnitude is involved, it is impossible for the lessee to discharge its duty to the lessors. But the record here reveals that there is little more than a semblance of action on the part of Amoco to act in the interests of these particular owners and there is no action favorable to the Jacobs.

In *Peterson* this court was again confronted with the alleged abuse of its authority in committing an oil, gas or mineral lease to a common development plan. It is stated there that the relationship between the lessor and the lessee was analogous to that of principal and agent so that the lessee or the lessor had the duty to exercise a high degree of good faith and loyalty for the furtherance and advancement of the interest of his principal. *Peterson, supra,* at 833–34. In further speaking on the subject, the *Peterson* court said:

> "A lessee is bound by implied covenants in the lease to diligently explore and develop the land, and to do so under a fair unitization plan. If unitization is affected in the case of unitization to act fairly and in good faith with due regard to the lessors interest, and to provide for fair apportionment of the oil produced.

The Jacobs cite this language in *Peterson* as support for their contention that the good faith duty owed by Amoco in the exercise of its unitization authority required Amoco to act as their agent and resolve all conflicts of interest in favor of the principal—here, the Jacobs. The Jacobs also contend that the holder of multiple interests and powers to unitize leases, in exercising each such power, ... in the absence of the joinder of each of his principals, must act as though the holder held only the power being exercised, and otherwise had no other interests or powers in the subject properties. The agent in such situation is not empowered to act to the detriment of his principals' interests even if *the holder of such power might think that such is for the good of the community at large.*

In *Phillips Petroleum v. Peterson* the Tenth Circuit opinion commented on its earlier statement as follows: it said

> It is well settled that an agent must not, except with its principals full knowledge and consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has an individual interest or represents interests adverse to those of his principal. 218 F.2d 934.

The court went on to say that

> It is equally well settled that an agent may act with respect to matters involving interests adverse to its principal, where the principal possesses full knowledge of the facts and consents thereto. In such a case the agent owes a duty to exercise a high degree of good faith and loyalty for the furtherance and advancement of the interest of his principal. *Id.*

The court went on to say

> Where there is also a lessor-lessee relationship the agent lessee is also obligated to keep and perform the implied covenants of his lease. *Id.*

The court continued

> A lessee is bound by implied covenants in the lease to diligently explore and develop the lease and to do so under a fair unitization plan, if unitization is effected; to market the production if the oil and gas is found in paying quantities; to do that which an opeerator of ordinary prudence having due regard for the interests of the lessor and the lessee, would do, and in case of unitization, to act fairly and in good faith with due regard for the lessor's interest and to provide for a fair apportionment of the oil produced. A lessee clearly may not act arbitrarily or capriciously.

The final conclusion of the Peterson court was that in this instance the interests of Peterson and Phillips Petroleum Company were mutual; it is said they must have worked together in the development of the unitization program. The court also had this to say about that question:

> Here the lessors of Phillips knew the benefits that would flow to Phillips from the unitization plan and agreement. They were fully apprised of the interests of Phillips in the unitization plan and agreement. They knew that Phillips, in entering into a unitization plan and agreement would, not for itself with respect to the working interest as well as for the lessors with respect to their royalty interest, with such knowledge by

Section 12 they clearly manifest their consent for Phillips to act in its and in their behalf in entering into a plan of unitization and agreement subject to the condition that the plan and agreement would be approved by governmental authority. It follows that even if it can be said that the interests of Phillips were to some extent adverse to the interests of the lessors they were bound by their consent given with full knowledge of the facts. The final conclusion was that section 12 of the unitization agreement fully authorized Phillips to unitize the land covered by the leases involved in the instant case and to enter into a contract to effectuate the unit plan of development and operation, so long as Phillips acted in good faith, fairly and with due regard for the interests of the lessors, as well as its own interests and that Section 12 was sufficiently specific to measure the scope of the agents authority in the premises.

In the present case it is noteworthy that the Jacobs, husband and wife, signed the initial contract in 1971. This had provisions in it with respect to the unitization. It seems somewhat questionable in 1981 to hold these lay people to a complex unitization agreement provision in small print that was signed ten years before and which was, at that time, primarily a lease.

*Boone* and *Peterson* have been interpreted and applied by a United States District court in North Dakota, *Sotrana-Texas Corporation v. Mogen*, 551 F.Supp. 433 (S.D. N.D.1982). That district court charges that the Tenth Circuit abandoned the analysis and statement of Judge Phillips in *Peterson*. This is based on the judge's conclusion that the two parties worked on a mutual basis in developing the unitization program. This cooperative approach is the standard which we recognize here. In our view the parties would not be here now if there had been a mutual participation. The numerous owners here have as much or more interest in the success of the unitization. We do not agree that the *Peterson* court abandoned what it had said about the fiduciary character of the relationship of the principal and the agent in the organization of the unitization program.

The Jacobs concede the appropriateness of this restrictive analysis in the typical "good faith" dispute where the issue is whether commitment of the lease to unitization,—any unitization—is the issue. However, they contend, that such an analysis is not appropriate where, as here, the issue is whether the particular terms of a particular unit agreement evidence lack of good faith on the part of the lessee. *Id.*

This court's analysis is not ended by simply determining that inquiry into the good faith exercise of Amoco's power to unitize should focus on whether the available geologic data justified formation of the Bravo Dome Unit pursuant to the particular terms of the Unit Agreement. This court must further decide what standard to apply in measuring Amoco's performance of this duty to evaluate the geologic data and form an appropriate unit. Surely there is more to a cooperative program than evaluation of geologic data.

■ The majority of oil and gas producing jurisdictions favor the good faith although some prefer the prudent operator standard. We do not know what the prudent operator standard is but it is necessarily very narrow if it is left up to the operating company to make all decisions at the same time. Necessarily the operator would function in a case like this in which there are numerous lessors in the unit, somewhat differently than in a small unit. A prudent operator is able to make a plan and carry it out and can thereby bind the participants. It is not the same as the requirement of fairness; on the contrary it invites unfairness. Rather, there should be a mutual benefit approach and the operator should communicate with the lessor to the extent possible. Thus, as Judge Phillips said in *Peterson*, the effort should be mutual. He should not be forced into it with an attitude of do this or nothing at all. We are not saying that there should be a system that is binding in every instance on both sides. Sometimes the lessee's judg-

ment is valid and should be followed but it ought not to be governed completely by the prudent operator. The decision might be prudent but only from the standpoint of the operator. In other words what is good for the agent is not necessarily good for the owners. It may be that the lessor cannot be consulted at all times, but it would be helpful if an effort was made to bring about knowledge and approval of the lessors wherever possible. We mention this because it was approved by Judge Phillips in *Peterson*. Certainly this would be better than giving the promoter unlimited power. Both *Boone* and *Peterson* stress and emphasize that there must be good faith on both sides, if it is a mutual approach in which there certainly is more likelihood that good faith will govern and that is the ultimate objective. Good faith is at odds with a prudent operator standard. Rather good faith calls for a mutual approach by the parties.

## CONCLUSIONS

In closing it is important to note some of the surrounding circumstances besides that which has been mentioned previously, namely the ten year lease during which Amoco did not make any effort to determine whether there was carbon dioxide in quantities which would justify drilling. *Secondly*, the Bravo Dome Unit included approximately 1,035,000 acres, the largest unit ever proposed in New Mexico and perhaps the United States. This is noted in the Order of the Oil Commission, para. 22, Record, Volume I at 55. Moreover, the commercial exploitation of large fields of carbon dioxide gas is a recent development, the gas seeks to inject into oil wells so as to enhance secondary and tertiary recovery of oil from mature wells. *Id.*, para. 18, at 55. Consequently, the state regulatory oversight commission, the Oil Commission, had no experience with the long-term operation of large-field carbon dioxide units. *Id.*, para. 24, at 55. *Third*, the developed acreage within the Bravo Dome Unit is very small compared to the total unit area, so that the Unit must be considered an exploratory unit, with all the attendant uncertain-

ties and risks. *Id.*, para. 13, at 54. *Fourth*, Amoco holds approximately 74 percent of the leases in the Bravo Dome Unit. (See District Court's Findings of Fact and Conclusions of Law, FOF 11, Record, Volume I, at 214.) Such a high percentage of ownership by Amoco of the Unit's working interests introduces a potential conflict of interest with royalty interest owners such as the Jacobs. It also makes it more difficult for any individual owner or lessor to obtain fair treatment. There are a limited number of findings of fact and conclusions of law which the Jacobs challenge.

Findings of fact include numbers 26, 27, 28; and conclusions of law include numbers 5, 7, 8. Finding of Fact No. 26 states that the terms and provisions of the unitization agreement as implemented by the Oil Conservation Commission contained fair, adequate and reasonable provisions in connection with the exploration and development of defendants' land as part of the unit and contained fair, adequate and reasonable provision concerning the marketing of $CO_2$ and the taking by defendants of a share of unit production. Finding of Fact No. 27 states that the interests of plaintiff and defendants are essentially mutual and what will serve the best interest of plaintiff will likewise serve the best interests of defendants. The third Finding of Fact is No. 28 which states that there is no evidence that plaintiff acted otherwise than in good faith, fairly and with due regard to the interests and rights of defendants in connection with the unit agreement in dedicating defendants' lands to the unit created thereunder.

The following are the conclusions of law which the plaintiffs contend are invalid:

No. 5. Plaintiff did not breach its duty to defendants to act in good faith by committing the lands covered by the April 26, 1971 lease to the Bravo Dome Carbon Dioxide Gas Unit.

Conclusion of Law No. 7. Commitment of the lands covered by the April 26, 1971 lease to the Bravo Dome Carbon Dioxide

Unit Agreement extends the lease for so long as it remains committed to the Unit.

Conclusion of Law No. 8. The terms and provisions of the unit agreement protect all correlative rights of the defendants and of the challenged findings of fact.

## ADDITIONAL ARGUMENTS OF THE JACOBS

The Jacobs contend that particular provision of the Bravo Dome Unit Agreement attacks the magnitude of the Bravo Dome Unit as a factor in the alleged abuse by Amoco. Because of the size of the Bravo Dome Unit and the importance of the issues involved, each of the challenged provisions must be discussed in turn.

*First*, the Jacobs claim that the New Mexico Oil Commission's revision of the Unit Agreement to include further safeguards shows that Amoco failed to draft an adequate unit agreement protecting the correlative rights of both working interest owners and royalty interest owners. The answer given to that was that the fact that the Oil Commission retained jurisdiction over implementation of the Unit and added further filing and approval safeguards to Unit operation does not, it is true, show that Amoco's conduct fell below that of a prudent operator in forming the Unit. Rather, the Oil Commission's conditional approval of the Unit Agreement merely reflects its concern for the unprecedented size of the Unit, the tentative nature of the geologic reservoir data available at the time, and the Oil Commission's own lack of experience with the long-term operation of such a unit. The Oil Commission did not find that the Unit Agreement failed to adequately provide for fair unit development; in fact, the Commission made a finding that "the unit agreement at least initially provides for development of the unit area in a method that will serve to prevent waste and which is fair to the owners of interests therein." Thus, it cannot be said that the district court erred in rejecting the Jacobs' contention as to this part.

The terms and provisions of the unit agreement are not per se invalid. When it is considered that this arose out of the ten year lease (in the case of the present plaintiffs), it takes on a different specter. The fact that the receipt of the blessing of the Oil Commission does not in and of itself result in the conclusion that it was valid. The Commission did not find that the unit agreement failed to adequately provide fair unit development. The Commission found that "the unit agreement, at least initially provides for development of the unit area in a method that will serve to prevent waste and which is fair to the owners of interests therein." The Commission cannot by its approval establish that the area is fair to the owners of interest therein. So the district court cannot be ruled from that fact alone to have erred in rejecting the Jacobs' contention.

The Jacobs contend that the unfair treatment of lessors reflected in paragraphs 3.3, 4.2, 6.3 and Articles 5 and 11 may show that Amoco has abused its powers to unitize. After reviewing each of the identified provisions of the Unit Agreement, this court cannot make a determination of abuse.

Despite the Jacobs' contention, paragraph 3.3 does not eliminate Amoco's implied obligations in the development of the leased property. Instead, unitization modifies those obligations to apply unit-wide. Furthermore, paragraph 4.2 explicitly imposes on Amoco the duty to exercise "reasonable diligence" in the operation of the unit. There again there is no proof that this brought about the exercise of reasonable diligence.

Further, and again contrary to the Jacobs' allegation, paragraph 4.2 does not lack necessary "checks and balances" on the authority of Amoco nor does it fail to consider future changes in the unit and it does not provide a framework for accommodation. Paragraph 4.2 requires the formation and submission to the State of periodic development plans. Additionally, the provision requires the plans to be modified to "meet changed conditions or to protect the interests of all parties to this agreement."

■ Again, as we previously stated, the mere fact that the Oil Commission imposed supplemental filing and approval requirements on Amoco's operation of the Unit does not prove that Amoco's conduct in drafting this provision fell below that of a reasonably prudent operator under the circumstances nor does it prove that Amoco's conduct in drafting this exceeded the good faith or cooperation standards. Thus, as applied to this state of facts, there is no likelihood that it could prove to be a standard which would dictate the propriety of what has been going on. The fact that all these years have passed and that there is no indication of a successful result in the unitization agreement, does not encourage the application of the prudent operator approach.

We have previously noted that this court held in *Boone* and *Peterson* that the lessee must be in good faith in the exercise of its authority to unitize. *See Boone, supra,* at 65 and *Peterson, supra,* at 935. The good faith standard is not the only one that was set forth in *Peterson,* wherein the court through Judge Phillips stated that there was an obligation on the part of the lessee to bring the lessors into the planning of the program. No evidence is shown that anything of this kind was carried out. Amoco would appear to have been running the entire program, from all we have been able to gather. The evidence does show that Amoco has drilled 35 holes, but seemingly none of them are in the general area of the *Peterson* property. Moreover, none of these have been shown to have become producers. The good faith standard, even though it is not followed in some oil producing states, certainly is more fair than the prudent operator standard, which isn't fair at all. As far as the present plaintiff is concerned the drilling of the holes in question has not produced significant results.

The use of the good faith standard is in accord with the law of New Mexico where the courts apply the prudent operator standard to test the lessee's performance of his implied obligation. *Clayton v. Atlantic Refining Co.,* 150 F.Supp. 9. The *Clayton* case holds that it could be in accord with the principle of cooperation on which the implied obligation in oil and gas leases ultimately rests. But the record that is before us surely does not establish that the cooperation principle has been put to work. This purpose of good faith is not served by a mere subjective standard; that is, the lessees' restraint from dishonest conduct. It is apparent that it will not, by itself, promote efficient results in the development of the leased property. The purposes of the lease require that the lessee conduct operations on the leasehold or commit the leasehold to community development in a manner customary in the industry.

Accordingly the application of the prudent operation standard to test the lessee's exercise of its authority to unitize best serves the operator and doesn't have any tendency in and of itself to serve the interests and the rights of the lessee. The text of *William & Myers, supra,* § 802.1, at 8–9 discusses the principle of cooperation and states that it requires that parties to a contract cooperate in order to carry out the purposes of the agreement. This court has recognized the duty to cooperate in *Boone,* when it was stated that good faith required "that what is done must be done honestly to effectuate the object and purpose the parties had in mind" and further that the "object and purpose" was to develop the oil and gas resources with the greatest efficiency. *Boone, supra,* at 65.

There are some further circumstances which are to be noted here. First, the size of this unitization. Before this the largest unit ever formed had 400,000 acres. Second, the commercial exploitation of large fields of carbon dioxide gas is a recent development. The gas sought is injected into oil wells to enhance secondary and tertiary recovery of oil from mature wells. As a consequence, the state regulatory oversight commission, the Oil Commission, has had no experience with the long-term operation of large-field carbon dioxide units. Order of the Oil Commission, para. 22, Volume I, at 55.

The cooperative approach certainly has been successful in the relationships with the state and federal commissions. *Third* the developed acreage within the Bravo Dome Unit is very small compared to the total unit area, so that the Unit must be considered an exploratory unit, with all the attendant uncertainties and risks. *Fourth*, Amoco holds approximately 74 percent of the leases in the Bravo Dome Unit. District Court's Findings of Fact and Conclusions of Law, FOF 11, Record, Volume I, at 214. Such a high percentage of ownership by Amoco of the Unit's working interests is bound to introduce a potential conflict of interest with royalty interest owners such as the Jacobs. Consequently these particular circumstances have to be considered in applying the aforesaid legal test.

Here the Jacobs have some basis for complaining. They contend that the Bravo Dome Unit Agreement is unenforceable because they never consented to formation of the Unit pursuant to the particular terms of the Unit Agreement. It would appear that the Jacobs' objection is that they are required as a condition precedent to commitment to the Lease in order to participate in the Unit.

In *Peterson, supra,* this court recognized that lessors are bound by their consent to unitization conferred on the lessee by the unitization clause of the Lease. Absent special circumstances, there is a presumption that the lessors are fully apprised of the interest of the lessee in unitization and that the lessors know that "in entering into a unitization plan and agreement [the lessee will] act for itself with respect to its working interest, as well as the lessors with respect to their royalty interests." But ten years have gone by and the testimony shows that there is no paying production although numerous holes have been drilled in areas beyond the Jacobs tract. If more missionary work had been done by Amoco, it is possible that this might have been avoided. It was not unexpected that Jacobs would expect that there would be some participation if and when it came to pass. It is entirely possible that Jacobs would not execute a formal consent form

after the formation. However, Article 7 concludes with a provision that after adoption of a unit plan by the lessee and approval of it by any governmental agency, on request of the lessee the "lessor shall formally express lessor's consent ..."

We are cognizant of the fact that upon review the appellate court is not to retry the facts. A trial court's findings actually found are binding unless they are clearly erroneous. That doesn't say, however, that in accepting the findings at this stage that this will be the permanent law of the land on the subject matter. This project is subject to changes and the fact that we recognize the rule with respect to the findings does not mean that this is going to be the governing factor in the future.

■ We are inclined to affirm the judgment of the district court, inasmuch as the original lease contract made provision for a unitization program and indeed allowed action to be taken without the express approval of individual owners. It is noted that the Jacobs have challenged specific findings of facts numbered 26, 27 and 28, upon which we have commented and the conclusions of law numbered 5, 7 and 8. In view of the fact that this is such a program which is subject to change, it is our view that it is the right of the Jacobs to continue to pursue such contentions. Certainly, these open the issue of the standard of good faith and if further evidence develops, certainly the court should have an opportunity to be advised.

The Jacobs also have argued that the New Mexico Oil Commission's revision of the Unit Agreement whereby it includes further safeguards purportedly shows that Amoco failed to draft an ideal unit agreement protecting the correlative rights of both working interest owners and royalty interest owners. The Jacobs also contend that the unfair treatment of lessors reflected in paragraphs 3.3, 4.2, 6.3 and Articles 5 and 11 indicates that Amoco in some degree abused its powers to unitize. We have previously considered each of the identified provisions of the unit agreement

and it does not speak out loudly in terms of fair treatment. Amoco maintains that there exists checks and balances on the authority of Amoco. However, it is difficult to find them and also the plan is required to be modified as changes occur in order to "meet changed conditions or to protect the interests of all parties in the agreement". But the mere fact that the Oil Commission imposed supplemental filing and approval requirements on Amoco's operation shows that Amoco's program was subject to improvement.

We must also take note of the fact that the Jacobs have been unable to show the unfairness of Article 5 of the Unit agreement, which provides for the sharing of revenues. Perhaps there were not any revenues since none of these holes turned out to be producers.

Notwithstanding that the Jacobs surface is being put to service for the entire unitization tracts, has not been recognized by Amoco. Amoco merely responds that the agreement grants Amoco an easement and right to use the surface of the Jacobs property "as may be reasonably necessary for Unit Operations and the removal of Unitized Substances from the Unit Area." The Jacobs contend that Amoco's commitment of the surface rights and underground water of their 2,160 acres to the burdens of production on the 1,035,000 acres of the unit is an abuse of the power to unitize. Inasmuch as these facts are not fully developed, we are unable to express a conclusion as to this. The law is that the rights of the unitization and the use of the land of the lessor by the lessee beyond the standard of reasonable necessity for unit operations is not allowed. The unitization agreement requires compensation to the lessor for damages to crops, timber, fences, improvements, and other structures. But it does prohibit free use of the property for camp sites, water or gas injection plants, or gas processing. Although the Jacobs Lease makes no such provision, it does provide an indication that the agreement does recognize certain elements which are clearly guaranteed by the law.

The judgment of the district court is affirmed with the provision that if there are changed conditions in the course of the development, the Jacobs are free to seek fair treatment if the changed conditions are unfair to them or other lessors, by making a showing of such changes in condition to the court and seeking adjustments by the lessee in the exercise of the lessee's duty of good faith in light of the *Peterson* and *Boone* decisions.

In so holding we are giving recognition to the findings of the trial court but at the same time we recognize the rights of the Jacobs to utilize the surface of their land particularly where Amoco is not making use of it.

We also approve the ruling of our circuit in *Peterson*. We hold that the unitization process is not the sole function of the lessee—that it is a joint effort in which the lessors within their limited scope are entitled to participate with the lessee in the development.

### APPENDIX

7. Lessee also shall have the right to unitize, pool, or combine all or any part of the above described lands with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation, and particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement. In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the produc-

tion therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to Lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to Lessor shall be based upon production only as so allocated. Lessor shall formally express Lessor's consent to any cooperative or unit plan of development or operation adopted by Lessee and approved by any governmental agency by executing the same upon request of Lessee.