**AMOCO PRODUCTION COMPANY,**
Plaintiff–Counterdefendant–Appellant
and Cross–Appellee,

v.

**J. Casper HEIMANN; Owaissa Heimann, his wife; Roberta Nelson; Bobby D. Adee; Howard W. Robertson; Pauline Robertson, his wife; Johnann Adee, as Trustee for Sharon Adee and Dowlen Adee; J. Casper Heimann, as Trustee for Randall Lynn Heimann, Jay Dee Heimann, Gene Alvin Heimann and Russell Gary Heimann; Pauline Robertson, as Trustee for Van Howard Robertson; Deana Shugart, a married woman dealing in her sole and separate estate; and Johnann Adee, in her capacity as Personal Representative of the Estate of Fred P. Heimann, deceased, Defendants–Counterclaimants–Appellees and Cross–Appellants,**

**Rocky Mountain Oil and Gas Association; New Mexico Oil & Gas Association, Amici Curiae.**

Nos. 88–2070, 88–2072, 88–2255 and 88–2355.

United States Court of Appeals, Tenth Circuit.

May 24, 1990.

William F. Carr (Michael B. Campbell & John H. Bemis, with him on the brief), Campbell & Black, Santa Fe, N.M., for plaintiff-counterdefendant-appellant and cross-appellee.

Steven L. Tucker (Jerry Wertheim & Arturo L. Jaramillo, with him on the brief), Jones, Snead, Wertheim, Rodriguez & Wentworth, Santa Fe, N.M., for defendants-counterclaimants-appellees and cross-appellants.

Charles L. Kaiser and Mary A. Viviano, Davis, Graham & Stubbs, Denver, Colo., filed an amicus curiae brief for the Rocky Mountain Oil and Gas Ass'n.

Paul A. Cooter, Rodey, Dickason, Sloan, Akin & Robb, Santa Fe, N.M., filed an amicus curiae brief for the New Mexico Oil and Gas Ass'n.

Before SEYMOUR and BALDOCK, Circuit Judges, and THEIS, District Judge.[*]

BALDOCK, Circuit Judge.

Amoco Production Company (Amoco) appeals from a $4 million judgment arising out of its unitization of a carbon dioxide field in northeastern New Mexico. Amoco argues, *inter alia*, that the district court 1) misinstructed the jury on an oil or gas lessee's duty of good faith, and 2) improperly failed to accord collateral estoppel effect to the findings of the New Mexico Oil Conservation Commission (OCC). Our jurisdiction over this diversity case arises under 28 U.S.C. § 1291. We hold that 1) a good faith inquiry into an oil and gas lessee's conduct is unnecessary where the unitization previously was approved by an independent state agency which passes on the fairness of the participation formula, such as the OCC, and 2) the OCC's approval of the unitization plan in this case has collateral estoppel effect upon the appellees' challenge to the unit's allocation formula. Accordingly, we reverse.

## I.

Defendants–Counterclaimants–Appellees (the Heimanns) are a family of ranchers who have lived in northeastern New Mexico since the early part of this century. The Heimanns own 48,120 acres of ranch land in Union, Quay and Harding Counties, New Mexico. Between 1971 and 1974, the Heimanns executed three carbon dioxide ($CO_2$) and mineral leases with Amoco. Each of these three leases contained a unitization clause which granted Amoco the right to unitize the Heimanns' mineral interests with other lands in the area, subject to approval "by any governmental authority."

[*] The Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation.

The leases granted the Heimanns a one-eighth royalty of the net proceeds received from all oil, gas or $CO_2$ produced on their lands.

In the late 1970's, Amoco embarked upon a plan to pipe $CO_2$ from northern New Mexico to its west Texas oil fields in order to enhance recovery there. Amoco therefore sought to unitize the mineral rights to approximately 1,174,225 acres of land in Harding, Union and Quay Counties, including the Heimanns's land.[1] The proposed agreement for the "Bravo Dome" unit allocated royalties on the basis of "surface acreage;" production was allocated according to the total surface areas contained in each tract. Amoco sought approval of the Bravo Dome unit from the OCC.[2] The Commission found that "approval of the proposed unit agreement should promote the preventions of waste and the protection of correlative rights within the unit area" and consequently approved the unit agreement. *Amoco Prod. Co.*, No. R–6446, unpub. order at 1 (N.M. Oil. Conservation Comm'n Aug. 14, 1980).

Together with other opponents of the Bravo Dome unit, all represented by counsel, the Heimanns successfully petitioned the OCC for rehearing. On October 9, 1980, the Heimanns and other opponents of the unit appeared before the OCC and presented evidence that the per-acre participation formula did not protect their correlative rights. The OCC found in pertinent part:

(14) That the evidence presented demonstrated that there are two methods of participation which would protect the correlative rights of the owners within exploratory units through the distribution of production or proceeds therefrom from the unit; these methods are as follows:

(a) a formula which provides that each owner in the unit shall share in the production from any well(s) within the unit in the same proportion as each owner's acreage interest in the unit bears to the total unit acreage, and

(b) a method which provides for the establishment of participating areas within the unit based upon completion of commercial wells and geologic and engineering interpretation of presumed productive acreage with only those parties of interest within designated participating areas sharing in production. Such participation would be based upon the proportion of such owner's acreage interest within the participating area as compared to the total acreage within the participating area.

(15) That each of the methods described in Finding No. (14) above was demonstrated to have certain advantages and limitations.

(16) That there was no evidence upon which to base a finding that either method was clearly superior upon its own merits in this case at this time.

(17) That the method of sharing the income from production from the unit as provided in the Unit Agreement is reasonable and appropriate at this time.

. . . . .

(25) That the evidence presented in this case establishes that the unit agreement at least initially provides for development of the unit area in a method that will serve to prevent waste and which is fair to the owners of interests therein.

. . . .

*Amoco Prod. Co.*, No. R–6446–B, unpub.

---

1. Amoco held a 74% working interest in the unitized lands.

2. Although its name might suggest otherwise, the New Mexico Oil Conservation Commission and its parent, the Oil Conservation Division, maintain jurisdiction over carbon dioxide resources as well as hydrocarbons. N.M.Stat.Ann. § 70–2–34. Under New Mexico law, the same provisions which relate to natural gas apply to $CO_2$, insofar as they are applicable. *Id.*

order at 3–4 (N.M. Oil. Conservation Comm'n Jan. 23, 1981).

The Heimanns appealed the OCC's order on rehearing to the New Mexico state district court for Taos County. They argued that there was not substantial evidence supporting the OCC's determination that the proposed unitization would protect their correlative rights. The district court, however, affirmed the Commission. *Casados v. Oil Conservation Comm'n*, No. 81–176, unpub. order at 4 (N.M. 8th Dist. Apr. 5, 1982). The Heimanns appealed the district court's order to the New Mexico Supreme Court which affirmed. *Casados v. Oil Conservation Comm'n*, No. 14,359, unpub. order at 8 (N.M. Nov. 10, 1983). The Supreme Court held that the record contained "substantial evidence in the record supporting the Commission's conclusion that the correlative rights of all property owners in the Bravo Dome Unit area will be protected." *Id.*

In 1984, Amoco filed suit against the Heimanns in federal district court seeking a declaratory judgment under 28 U.S.C. § 2201(a) that Amoco had properly unitized the interests covered under the leases. The Heimanns counterclaimed alleging three theories of recovery: 1) unfair allocation of royalties under the unitization agreement; 2) undervaluation of the extracted $CO_2$; and 3) surface damage. At the conclusion of the trial, the court instructed the jury on the components of Amoco's good faith duty which it was obliged to follow in exercising its powers under the unitization clause:

### INSTRUCTION NO. 18

Amoco's duty of good faith is not fulfilled merely by refraining from dishonest conduct. Rather, Amoco has certain affirmative duties which it must fulfill as a prerequisite to a finding of good faith. These are:

(a) Disclosure to the Heimanns of the material facts affecting their interest in the proposed unitization, including the geological and geophysical characteristics of their lands compared with that of other lands within the proposed unit area, and the significance of that data as it affects the Heimanns' interest;

(b) Cooperation with the Heimanns in planning the unitization program. Such cooperation may consist of communicating to the extent possible with the Heimanns in an effort to impart pertinent knowledge to the Heimanns; and

(c) Disclosure to the Heimanns of any interests of Amoco in unitization which were adverse to the interest of the Heimanns.

The jury returned a special verdict in favor of Amoco on the fair market value and surface damage claims, but found for the Heimanns on the royalty allocation charge. The jury awarded the Heimanns damages in the amount of $3,500,000 compensatory damages and $500,000 punitive damages. The district court then held that Amoco had violated its duty of good faith and declared the unitization of the Heimanns lands void.

## II.

Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply.[3] 1 B. Kramer & P. Martin, *The Law of Pooling and Unitization* § 1.02 at 1–3 (3d ed.1989); *see Parkin v. Corporation Comm'n of Kansas*, 234 Kan. 994, 677 P.2d 991, 1002 (1984). Unitization resulted from state legislatures' efforts to modify the rule of capture which had previously been applied to oil and gas law. *See Clark Oil Prod. Co. v. Hodel*, 667 F.Supp. 281, 290 (E.D.La.1987); Kramer & Martin, *supra* p. 1410, § 3.02. The goals of unitiza-

---

**3.** While frequently used interchangeably, the terms "pooling" and "unitization" refer to separate procedures. Pooling involves the combination of several small tracts of land to meet the spacing requirements for a single well. Unitization refers to field-wide or partial field-wide operation of a producing reservoir involving multiple adjoining land tracts. 6 H. Williams & C. Meyers, *Oil and Gas Law* § 901 at 2 (1989); R. Hemingway, *Law of Oil and Gas* § 7.13 (1983).

tion are conserving resources by preventing waste and protecting landowners' correlative rights.[4] *See, e.g.,* N.M.Stat.Ann. § 70-2-11 (1987 Rep.Pamp.). Following unitization of an oil field, the royalty clause of a oil and gas lease generally is modified and the lessor becomes entitled to a royalty based on a pro rata share of the production attributable to its land, regardless of whether production is from that land or another tract included within the unit. Williams & Meyers, *supra* n. 3, § 951 at 694.12. The working interest owners' share is based on a participation formula calculated from geological, physical and economic data. Kramer & Martin, *supra* p. 1410, § 17.02[5]. No single method of calculating the participation formula is appropriate for all situations, Williams & Meyers, *supra* n. 3, § 970 at 816.5, and although the most frequently employed basis for allocating unitized production is surface acreage, *id.* § 970.1 at 816.6, arriving at a perfect participation agreement is impossible. Kramer & Martin, *supra* p. 1410, § 17.02[5][a] at 17-16. As this court has explained:

> The percentage of an estimated pool recovery under a unitized operation assigned to a particular lease represents at best only an estimated contribution from that tract under a single unitized operation. Without more, it cannot be taken as evidence of the estimated recovery therefrom under an independent, individual operation of the lease.

*Stanolind Oil & Gas Co. v. Sellers,* 174 F.2d 948, 956 (10th Cir.), *cert. denied,* 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531 (1949).

■ Two methods exist whereby separately-owned tracts can be combined in a single unit: voluntary unitization by contract or forced unitization by regulatory authority. *See* Douglass, *Powers and Problems of Lessee Pooling,* 34 Sw.Legal Fed'n Oil & Gas Inst. 231 (1983). Because the Bravo Dome unit resulted from Amoco's voluntary petition to the OCC, we concern ourselves here with voluntary unitization.

■ The unitization clause of an oil and gas lease grants the lessee the power to unitize the lessors interest without further consent by the lessor.[5] Kramer & Martin, *supra* p. 1410, § 8.01 at 8-1; Hemingway, *supra* n. 3, § 7.13. Without such a clause, the lessee has no authority to pool or unitize the interests of the lessor. Kramer & Martin, *supra* p. 1410, § 8.01 at 8-2. *See also Celsius Energy Co. v. Mid Am. Petroleum,* 894 F.2d 1238, 1240 (10th Cir.1990) (language of lease determines extent of lessee's pooling authority). Because neither the lessor nor the lessee usually know the relevant facts concerning the need for unitization at the time the lease is signed, unitization clauses must be framed in general terms. *Phillips Petroleum Co. v. Peterson,* 218 F.2d 926, 933 (10th Cir.1954), *cert. denied,* 349 U.S. 947, 75 S.Ct. 871, 99 L.Ed. 1273 (1955); Kramer & Martin, *supra* p. 1410, § 8.01 at 8-2; Hemingway, *supra* n. 3, § 7.13 (unitization clauses in oil and gas leases are to be interpreted liberally). *But see Leonard v. Barnes,* 75 N.M. 331, 404 P.2d 292, 301 (1965) (where an oil and gas lease contains no express provision to unitize, courts will not strain to interpret contract to provide for unitization or pooling).

■ In addition to contractual limitations on the exercise of the lessee's unitization power, an oil and gas lessee owes the lessor the additional duty of fair dealing, often stated in terms of good faith. Kramer & Martin, *supra* p. 1410, § 8.06 at 8-32; Hemingway, *supra* n. 3, § 7.13. In *Boone*

---

**4.** "Correlative rights" are "rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply." *United Petroleum Exploration v. Premier Resources,* 511 F.Supp. 127, 129 (W.D.Okla.1980).

**5.** Such clauses can be said to effectuate voluntary pooling or unitization in that the pooling or unitization is not compelled by state authority. On the other hand, because such clauses inevitably vest the lessee with the unilateral power to pool or unitize, the pooling or unitization implemented under such clauses is not voluntary for the lessor. *See* Kramer & Martin, *supra* p. 1410, § 8.02 at 8-2.

*v. Kerr–McGee Oil Indus.*, 217 F.2d 63 (10th Cir.1954), this court explained that the good faith duty is necessary because of the unilateral power vested in the lessee by a unitization clause:

> Where discretion is lodged in one of two parties to a contract or a transaction, such discretion must, of course, be exercised in good faith. That simply means that what is done must be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power. All the authorities are to this effect.
>
> In approaching a consideration of this question, we keep in mind a further principle and that is that the law presumes that men will act honestly and fairly in dealing with each other. In other words, the law presumes honest and fair dealing, and bad faith or fraud is never presumed and must be established affirmatively.

*Id.* at 65 (footnote omitted). In *Peterson*, we further explained the good faith duty of oil and gas lessees in effectuating voluntary unitization agreements:

> A lessee is bound by implied covenants in the lease to diligently explore and develop the lease, and to do so under a fair unitization plan, if unitization is effected; to market the production if the oil and gas is found in paying quantities; to do that which an operator of ordinary prudence, having due regard for the interests of both the lessor and the lessee, would do; and, in case of unitization to act fairly and in good faith, with due regard for the lessors' interests, and to provide for a fair apportionment of the oil produced.

218 F.2d at 934 (footnote omitted). Because the unitization plan at issue in *Peterson* increased efficiency of oil production, we held the lessee's unitization to be in good faith. *Id.*

▆▆▆▆ A lessee's good faith is often called into question when the pooling or unitization power is exercised close to the end of the primary term, Kramer & Martin, *supra* p. 1410, § 8.06[2]; *see, e.g., Amoco Prod. Co. v. Underwood*, 558 S.W.2d 509, 512–13 (Tex.Civ.App.1977) (where unit established solely to retain leases that would otherwise expire, lessee acted in bad faith); *but see Boone*, 217 F.2d at 65–66 (mere fact that only a few months remained in lease at time of unitization did not constitute bad faith), when the lessee includes nonproductive land in the unit, Kramer & Martin, *supra* p. 1410, § 8.06[2]; *see, e.g., Southwest Gas Prod. Co. v. Seale*, 191 So.2d 115, 121 (Miss.1966), or when the lessee's economic interests are antagonistic to those of the lessor, Kramer & Martin, *supra* p. 1410, § 8.06[2]. However, when and how to drill usually remains the prerogative of the driller; a mere exercise of that power contrary to the desires of the lessors or the weight of geological opinion does not, in itself, show a lack of good faith. *Diggs v. Cities Serv. Oil Co.*, 241 F.2d 425, 427 & n. 2 (10th Cir.1957). Moreover, although the lessee's duty of good faith requires that it take the lessor's interest into account in exercising its powers under the unitization clause, the lessee need not subordinate its interest entirely to those of the lessor. *See Elliott v. Davis*, 553 S.W.2d 223, 226–27 (Tex.Civ.App.1977). Thus, although the lessee's good faith duty has at times been referred to as fiduciary, such standard is altogether too strict. *See Amoco Prod. Co. v. Jacobs*, 746 F.2d 1394, 1398–99 (10th Cir.1984); *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 206 (Tex. App.1986).

### A.

The district court understandably relied upon this court's opinion in *Jacobs* for the proposition that, in order to satisfy the duty of good faith, a lessee must: 1) disclose geological facts affecting the lessor's interest in the unitization; 2) cooperate with the lessor in planning the unitization; and 3) disclose any interest in the unitization adverse to the lessor. While *Jacobs* contains language that can be read to support this view, 746 F.2d at 1401, we cannot determine from the text of the opinion whether this court actually intended to create such an expansive definition of good

faith.[6] After consulting *Boone, Peterson* and other cases and authorities on unitization, however, we conclude for the reasons stated below that *Jacobs* did not intend to create such an unprecedented rule of good faith.

 Although inclusion of geologically inferior land in the Bravo Dome unit by lessee Amoco could violate its duty of good faith, no authority imposes a duty upon lessees to produce and disclose geologic facts to a lessor comparing the lessor's mineral interests to those in the rest of the unit. Under New Mexico law, an oil or gas lease must be given the legal affect resulting from the language within the four corners of the instrument, absent ambiguity. *See Owens v. Superior Oil Co.*, 105 N.M. 155, 156, 730 P.2d 458, 459 (1986). Because the Heimanns assented to a lease which unequivocally granted Amoco the power to unitize, subject to approval by governmental authority, we decline to stray beyond the four corners of the lease to impose upon Amoco a duty to cooperate with the lessor in planning its unitization. If Amoco operated the Bravo Dome unit in a manner adverse to the Heimanns' interest, such conduct might constitute bad faith. However, no authority imposes an affirmative duty upon a lessee to disclose every interest in a unitization adverse to the lessor and we decline to create one here.

While we understand how the district court, relying upon the equivocal language in *Jacobs*, reasonably could conclude that its Instruction No. 18 correctly stated the lessee's duty of good faith, we conclude that the court's instruction was too broad. Because we hold that the OCC's approval of the Bravo Dome unit renders the good faith inquiry unnecessary in this case, we do not address whether the erroneous instruction prejudiced Amoco.

**B.**

A good faith duty is imposed where unbridled discretion is vested in an oil or gas lessee by a unitization clause. *See Boone*, 217 F.2d at 65. If a lessee had complete discretion in unitizing an oil or gas field, the lessee might, in bad faith, combine lessor's land with less productive land, calculate a production formula which underrepresents the lessor's mineral interest, or unitize solely to avoid the termination of a lease. But where a neutral and detached agency approves a proposed unitization after undertaking an extensive and independent study of geological, physical and economic data, the agency normally will constrain such abuses by a lessee. *See Celsius Energy*, 894 F.2d at 1240 (good faith requirement imposed to limit lessee's broad authority under pooling clauses).

A good faith duty also may serve to assure the fair allocation of oil and gas produced by the unit. *See Phillips*, 218 F.2d at 934. Where the lessee maintains complete discretion in formulating a unitization plan, the lessee might abuse that discretion and select a participation formula which underrepresents the contribution to the unit from the lessor's land. However, where an agency such as the OCC passes upon the fairness of a proposed participation formula, concerns of lessee unfairness are ameliorated. For unless a proposed unitization plan provides for a fair participation formula, it will not win OCC approval. *See N.M.Stat.Ann. §§ 70–2–11, 70–2–33(H); see also N.M.Stat.Ann. § 70–7–6(B)* (approval criteria under Statutory Unitization Act).

Evaluating the statutory framework behind the OCC, we are convinced that it ameliorates the danger of lessee unfairness which gave rise to the good faith duty. Where approval of a unitization plan is

---

**6.** We are not alone in our inability to decipher *Jacobs*'s holding; several scholarly works have expressed similar difficulty. *See, e.g.,* Kramer & Martin, *supra* p. 1410, § 17.01 at 17–3 n. 4 (criticizing *Jacobs*); E. Kuntz, J. Lowe, O. Anderson & E. Smith, *Cases and Materials on Oil and Gas Law*, 744 (1986) (suggesting students read *Jacobs* "[f]or a case illustrating the difficulty courts have in dealing with this question [of good faith]"). Moreover, it is apparent that the district court shared our confusion over *Jacobs* when it informed counsel: "[B]eing very frank with you, both you gentlemen on both sides are apparently ... as confused on what [*Jacobs*] said as I am." Rec.vol. IV at 350.

finally determined by the OCC, the dangers resulting from the lessee's complete discretion which concerned this court in *Boone* are absent. *See also Celsius Energy*, 894 F.2d at 1240. And where the OCC approves the participation formula after a careful and independent inquiry into the relevant geophysical and economic criteria, a fair allocation of proceeds is determined without resort to the lessee's good faith duty. Therefore, because the components of a lessee's good faith duty are necessarily encompassed within the OCC's approval criteria, it is a waste of judicial resources to conduct a second good faith inquiry here.[7]

■ We recognize that our analysis may conflict with language in *Jacobs* suggesting that the OCC cannot, by its "blessing" of a unitization plan, rule on the question of good faith. 746 F.2d at 1403–04. However, with all due respect, we believe this Court in *Jacobs* overlooked explicit statutory language empowering the OCC to rule on the fairness of a proposed unitization plan, *see* N.M.Stat.Ann. §§ 70–2–33(H); *cf.* N.M.Stat.Ann. § 70–7–6(B), and ignored the proper deference owed by federal courts to the findings of state administrative agencies, *see* discussion *infra* at 1414–1416. Given the elaborate procedures required for obtaining OCC approval of a proposed unitization, as well as the technical expertise possessed by its members, it is inaccurate to describe the Commission's approval process as a mere "blessing." *See* N.M.Stat.Ann. §§ 70–2–4 through 70–2–10. Therefore, we hold that where a state administrative agency, empowered to rule on the fairness of a unitization plan and entitled to full faith credit by a federal court, finds that a proposed

unitization adequately protects the correlative rights of all interested parties, said approval is conclusive on the issue of good faith. To the extent that *Jacobs* holds to the contrary, it is overruled.[8]

### III.

Having concluded that a good faith inquiry is unnecessary where the fairness of a unitization plan already has been adjudged by a regulatory agency entitled to full faith and credit by a federal court, we must determine whether the OCC is entitled to such credit.

### A.

■ Where a state agency acts in a judicial capacity, resolves facts properly before it and the parties have had an adequate opportunity to litigate, we accord the agency's decision the same preclusive effect to which it would be entitled in the state's courts. *University of Tenn. v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986). New Mexico has granted preclusive effect to the findings of administrative agencies acting within their proper capacity. *See State v. Rio Rancho Estates, Inc.*, 95 N.M. 560, 562, 624 P.2d 502, 504 (1981); *Property Tax Dept. v. Molycorp, Inc.*, 89 N.M. 603, 605, 555 P.2d 903, 905 (1976); *City of Socorro v. Cook*, 24 N.M. 202, 173 P. 682, 684–85 (1918). However, New Mexico courts have never considered the preclusive effect of an OCC decision. Applying the standard enunciated by the New Mexico courts, we therefore consult general principles of preclusion to anticipate the effect of the OCC approval of the Bravo Dome unit.

■ When an agency's function resembles that of a trial court, the agency

---

7. We note that the Amoco–Heimann lease did not require approval by the New Mexico Oil Conservation Commission, but rather, "by any governmental authority." In holding that the OCC's approval of the Bravo Dome unit is conclusive on the issue of good faith, we therefore limit our holding to the OCC and recognize that a different result may prevail under a different statutory scheme. *See, e.g., Samson Resources Co. v. Corporation Comm'n*, 702 P.2d 19, 23 (Okla.1985) (private action alleging good faith violation by unit operator was not precluded by Oklahoma Corporation Commission's previous approval of unit because action did not impli-

cate correlative rights, as defined under Oklahoma law).

8. Because this panel opinion overrules Tenth Circuit precedent, it has been circulated among all active judges of this court. All judges agree with the panel's holding that, because Amoco's good faith was necessarily encompassed within the OCC's consideration of the Bravo Dome unit, the Commission's approval of said unitization is conclusive on the question of Amoco's good faith.

adjudication is entitled to preclusive effect. 4 K. Davis, *Administrative Law Treatise* § 21:3 at 51–52 (1983). Conversely, where the agency's action is merely ministerial, *res judicata* and collateral estoppel do not attach. *Id.* In determining whether the administrative agency was "acting in a judicial capacity," *Elliott,* 478 U.S. at 799, 106 S.Ct. at 3226, no single model of procedural fairness is dictated by the due process clause, *Kremer v. Chemical Constr. Co.,* 456 U.S. 461, 483, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1981). Rather, we must look to our prior cases as well as the *Restatement (Second) Judgments* § 83 [9] to determine whether the OCC acts in a judicial capacity when it approves a proposed unitization plan.

In *Long v. Laramie County Community College Dist.,* 840 F.2d 743 (10th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988), we held that a state college grievance committee's finding that an employee had been harassed sexually was preclusive in a subsequent action brought under 42 U.S.C. §§ 1983, 1985. Because most of the parties before the grievance committee had been represented by counsel, witnesses were cross-examined, documentary evidence was introduced in accordance with the Wyoming APA and the committee rendered findings and recommendations which were reviewed by the College's Board of Trustees, we concluded that the commission was acting in a judicial capacity under *Elliott.*[10] *Id.* at 751. In *Katter v. Arkansas La. Gas,* 765 F.2d 730 (8th Cir.1985), the Eighth Circuit similarly held that an integration order by the Arkansas Oil and Gas Commission was entitled to full faith and credit in a subsequent action brought in federal court:

> Clearly the Arkansas legislature intended an adjudicatory, *in rem* order [by the Oil and Gas Commission] which, when final, would have all the force and effect of a court judgment; and in fact required and provided for all the things necessary to give it that effect. (citation omitted). In general, then, such an order would fix the parties' rights and duties as fully and finally as a court judgment—albeit here a default judgment—and would be entitled to the same full faith and credit and preclusive effect.

*Id.* at 734.

**B.**

■ The New Mexico Oil Conservation Commission consists of three persons: a

---

9. The Restatement provides in pertinent part:

 **§ 83. Adjudicative Determination by Administrative Tribunal.**

 . . . . .

 (2) An adjudicative determination by an administrative tribunal is conclusive under the rules of res judicata only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including:
 (a) Adequate notice to persons who are to be bound by the adjudication ...
 (b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut evidence and argument by opposing parties;
 (c) A formulation of issues of law and fact in terms of the application of rules with respect to specific parties concerning a specific transaction, situation, or status, or a specific series thereof;
 (d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and
 (e) such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.

 . . . .

 *Restatement (Second) Judgments* § 83 at 266–67 (1982).
 Although this section specifically refers to "res judicata," or claim preclusion, it also applies to collateral estoppel, or issue preclusion. *Id. comment b* at 270–71.

10. Both *Elliott* and *Long* considered whether state administrative fact findings are preclusive in a *federal* cause of action. In the instant case, arising as it does under our diversity jurisdiction, under the doctrine of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must consider whether the OCC's findings are preclusive in New Mexico courts. *See Braselton v. Clearfield State Bank,* 606 F.2d 285, 287 & n. 1 (10th Cir.1979). We rely upon *Elliott* and *Long* only for general preclusion principles to help determine whether the OCC's findings would be accorded collateral estoppel effect in the courts of New Mexico.

designee of the Commissioner of Public Lands, a designee of the Secretary of Energy, Minerals and Natural Resources and the Director of the Oil Conservation Division. N.M.Stat.Ann. § 70–2–4. The two designated members must be "persons who have expertise in the regulation of petroleum production by virtue of education or training," *id.*, while the third member must either be a registered petroleum engineer or else, by virtue of education and experience, have experience in petroleum engineering. N.M.Stat.Ann. § 70–2–5(B). The OCC has authority to subpoena witnesses, compel testimony and require production of books, papers and records relative to matters within the commission's jurisdiction. N.M.Stat.Ann. § 70–2–8. OCC members may administer oaths to any witness in any proceeding; a person who testifies falsely under oath before the commission is guilty of perjury. N.M.Stat.Ann. § 70–2–10 Hearings of the OCC are held in public, N.M. Oil Conservation Div.R. 1201 (1989), after providing interested parties with notice, N.M. Oil Conservation Div.R. 1204–07, and may be initiated upon the motion of any operator, producer or person having a pertinent property interest. N.M. Oil Conservation Div.R. 1203. All pleadings before the OCC must be mailed to adverse parties, N.M. Oil Conservation Div.R. 1208, and all testimony delivered before the Commission must be formally recorded, N.M. Oil Conservation Div.R. 1210. Any person testifying under subpoena or in support of or in opposition to a motion before the Commission must do so under oath. *Id.* The OCC's procedural rules further provide:

> Full opportunity shall be afforded all interested parties at a hearing to present

evidence and to cross-examine witnesses. In general, the rules of evidence applicable in a trial before a court without a jury shall be applicable, provided that such rules may be relaxed, where, by so doing, the ends of justice will be better served. No order shall be made which is not supported by competent legal evidence.

N.M. Oil Conservation Div.R. 1212. In reaching a decision, the OCC must make written findings of fact that have sufficient support in the record. *Fasken v. Oil Conservation Comm'n,* 87 N.M. 292, 294, 532 P.2d 588, 590 (1975). Any party adversely affected by an order of the Commission may petition for rehearing, N.M.Stat.Ann. § 70–2–25(A); any party dissatisfied with the disposition of the rehearing may appeal to the state district court, N.M.Stat.Ann. § 70–2–25(B), where the OCC's unitization decision is reviewed for substantial evidence, *Viking Petroleum v. Oil Conservation Comm'n,* 100 N.M. 451, 453, 672 P.2d 280, 282 (1983). Although New Mexico courts will accord "[s]pecial weight ... to the experience, technical competence and specialized knowledge of the Commission[,]" *id.*, the OCC's findings must be based on ultimate facts involving "foundationary matters," and "basic conclusions of fact[.]" *Continental Oil v. Oil Conservation Comm'n,* 70 N.M. 310, 373 P.2d 809, 814–15 (1962).[11]

Applying *Long* and the criteria enunciated in *Restatement (Second) Judgments* § 83, we are satisfied that the OCC's approval process is entitled to preclusive effect. As parties interested in the OCC's proceedings, the Heimanns received notice of the proposed adjudication, *see id.* § 83(2)(a), and, at least during the rehear-

---

**11.** *Continental Oil* contains language which, when viewed in isolation, suggests that the OCC is not acting in a judicial capacity for preclusion purposes when it approves a proposed unitization plan. 373 P.2d at 818. However, closer analysis of the holding belies such an interpretation. *Continental Oil* held: 1) that the OCC is statutorily required to engage in administrative factfinding on the question of waste and correlative rights; 2) that OCC decisions must be based on those "foundational" matters; and, 3) that separation of powers precludes courts from intruding upon the OCC's factfinding preroga-

tives. Whether the procedures followed by the OCC afford a sufficient degree of due process to be accorded preclusive effect in subsequent proceedings was a question that *Continental Oil* did not address. Accordingly, notwithstanding the semantic affinity of *Continental Oil* to the instant inquiry, the Heimanns' reliance upon *Continental Oil* for the proposition that OCC determinations are not entitled to preclusive effect is misplaced. *Cf. Rio Rancho Estates,* 624 P.2d at 504 (findings of New Mexico State Engineer have preclusive effect in subsequent proceedings).

ing, were represented by counsel, *see Long,* 840 F.2d at 751. The OCC employed trial-like procedures in which the Heimanns's enjoyed the opportunity to cross-examine Amoco's witnesses and present evidence and legal argument of their own. *See id; Restatement (Second) Judgments* § 83(2)(b). The OCC's order approving the Bravo Dome unit formulated the issues of law and fact in terms of their specific application to the Heimanns correlative rights, *see id.* § 83(2)(c), and New Mexico's procedures for appealing OCC orders provide a rule of finality specifying a point when presentations are terminated and decisions rendered final, *see id.* § 83(2)(d). Given this procedural framework, we are convinced that the OCC was acting in a judicial capacity when it approved the Bravo Dome unit; its decision is therefore entitled to preclusive effect. *See City of Socorro,* 173 P. at 684–85.

### IV.

■ Having concluded that the OCC's approval of the Bravo Dome unit is entitled to full faith and credit, we must now determine whether the Heimanns are collaterally estopped from challenging the fairness of the participation formula adopted as part of the unitization plan. Federal courts must apply the law of the state rendering the judgment to determine its collateral estoppel effect; we may not accord greater preclusive effect to a state court judgment than would the state in which the judgment is rendered. *Federal Ins. Co. v. Gates Learjet Corp.,* 823 F.2d 383, 385 (10th Cir. 1987); *see* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* Jurisdiction § 4472 (1981).

### A.

This court previously has recognized that decisions by state oil conservation agencies may be entitled to collateral estoppel effect. In *Chenoweth v. Pan Am. Petroleum,* 314 F.2d 63, 65 (10th Cir.1963), a lessor of unitized mineral interests sought cancellation of an oil and gas lease. Because the participation formula had been decided upon previously by the Oklahoma

Corporation Commission, we concluded that the lessor's action constituted an improper collateral attack upon the Commission's authority:

> The Oklahoma Corporation Commission has unitized the Oil Creek in this area and [plaintiffs] participate in this production under the established formula. Appellant ... objects to this unitization order and has an appeal pending on this matter in the Supreme Court of Oklahoma. He attempts to litigate the validity of this order on this appeal, but this cannot be done under these circumstances. To do so would clearly be a collateral attack on the order of the Commission.

*Id.* Other circuits have also recognized that unitization orders by state oil conservation agencies must remain inviolate to collateral attack. *See, e.g., Katter,* 765 F.2d at 734 (Arkansas law); *Trahan v. Superior Oil,* 700 F.2d 1004, 1015–19 (5th Cir.1983) (Louisiana law); *Mize v. Exxon,* 640 F.2d 637, 640 (5th Cir.1981) (Alabama law). But where a subsequent action does not directly or indirectly challenge a previous order by a state oil conservation commission, collateral estoppel and res judicata do not attach. *See, e.g., Greyhound Leasing & Financial Corp. v. Joiner City Unit,* 444 F.2d 439, 445 (10th Cir.1971) (lessor's action against unit operator for damages caused by secondary recovery methods did not constitute collateral attack to any order of the Oklahoma Corporation Commission); *Richardson v. Phillips Petroleum,* 791 F.2d 641, 646 (8th Cir.1986) (because denial of money damages was not necessarily encompassed in Arkansas Oil and Gas Commission's denial of injunctive relief halting secondary recovery operations, Commission's decision did not bar subsequent action for money damages).

### B.

■ New Mexico traditionally requires four elements for the invocation of collateral estoppel: 1) the parties are the same or are privies of the original parties; 2) the cause of action is different; 3) the issue or fact was actually litigated; and 4) the issue was necessarily determined. *In-*

ternational Paper Co. v. Farrar, 102 N.M. 739, 741–42, 700 P.2d 642, 644–45 (1985). We address these criteria in turn.

Same Parties: The Heimanns were included among the designated parties who sought and obtained rehearing of the OCC's approval of the Bravo Dome unit. They were also among the persons seeking reversal of the OCC's order in the state district court and the New Mexico Supreme Court.

Different Cause of Action: The administrative proceedings before the OCC and judicial proceedings before the New Mexico courts concerning the approval of the Bravo Dome unit constituted a separate and distinct cause of action from the present action in federal court alleging bad faith on behalf of Amoco.

Issue Actually Litigated: New Mexico employs two criteria for determining whether a proposed unitization may be approved by the OCC: 1) prevention of waste and, 2) protection of correlative rights. N.M.Stat.Ann. § 70–2–11. New Mexico defines correlative rights as follows:

> "correlative rights" means the opportunity afforded, so far as is practicable to do so, to the owner of each property in a pool to produce without waste his *just and equitable share* of the oil or gas or both in the pool, being an amount, so far as can be practically determined and so far as can be practicably obtained without waste, substantially *in the proportion that the quantity of recoverable oil or gas or both under the property bears to the total recoverable oil or gas* or both in the pool and, for such purposes, to use his just and equitable share of the reservoir energy.

N.M.Stat.Ann. § 70–2–33(H) (emphasis supplied). Taking the plain meaning of the relevant statute, inherent among the OCC's criteria for approving a unitization plan is the fairness of the participation formula. *See id.; accord* N.M.Stat.Ann. § 70–7–6(B). In this case, the Heimanns argue that the per-acre allocation of $CO_2$ revenues under the participation agreement did not fairly represent the quantity of recoverable $CO_2$ under their property. However, they made this very same argument before the OCC which concluded that, given the available geological knowledge, acreage was an appropriate criterion for the participation formula. Given the express statutory obligation of the OCC to protect "correlative rights," and the Commission's finding that the per-acre allocation of Brovo Dome unit revenues protected such rights, we must conclude that the fairness of the Bravo Dome Unit participation plan was "actually litigated" before the OCC. *See Chenoweth*, 314 F.2d at 65; *Katter*, 765 F.2d at 734.

Issue Necessarily Determined: Although New Mexico accords preclusive effect to the adjudications of administrative agencies in subsequent judicial proceedings, in order to have such effect, the administrative findings must have addressed questions which were essential to the agency's decision. *See Rio Rancho Estates*, 624 P.2d at 504. As stated above, in order to approve a unitization plan, the OCC *must* find that the participation formula protects the correlative rights of all pertinent parties. *See* N.M.Stat.Ann. § 70–2–11. And in order to determine that the Bravo Dome unitization protected the Heimanns' correlative rights, it was essential that the OCC rule upon the fairness of the unit's participation formula.[12]

---

12. The Heimanns cite this court's recent opinion of *Leck v. Continental Oil Co.*, 892 F.2d 68 (10th Cir.1989), for the proposition that collateral estoppel should not attach to the findings of the OCC. In *Leck*, we certified to the Oklahoma Supreme Court several questions concerning the jurisdiction of the Oklahoma Corporation Commission vis a vis the state courts. *Id.* at 68. Applying Oklahoma law, the Supreme Court held that the district court, not the Corporation Commission, had *jurisdiction* over a lessor's claim against the unit operator for breach of contract and violation of the operator's fiduciary duty to protect lessor's correlative rights. *Leck v. Continental Oil Co.*, No. 72,054, slip op. at 8, 10 (Okla. Nov. 28, 1989). The Oklahoma court limited its holding to the jurisdictional question and explicitly declined to address the *res judicata* or collateral estoppel effect of the prior adjudication before the Commission. *Id.* at 8. Accordingly, to the extent that the Heimanns rely upon *Leck* to argue that collateral estoppel should not attach to the findings of the OCC, their reliance is misplaced.

"[C]ollateral estoppel not only reduce[s] unnecessary litigation and foster[s] reliance on adjudication, but also promote[s] the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 415–416, 66 L.Ed.2d 308 (1980). Were this court to permit the Heimanns to relitigate issues already decided in a fair hearing by the OCC and affirmed by the New Mexico Supreme Court, we would intrude upon the jurisdiction of those two bodies. This would contravene established principles of comity and federalism and, after three levels of review, undermine judicial economy. We are convinced that the determination by the OCC and the New Mexico Supreme Court that the Bravo Dome unitization plan was fair and protected the Heimanns' correlative rights would be accorded collateral estoppel effect in the courts of New Mexico; full faith and credit requires that it be given similar treatment here.

The district court shall vacate the judgment in favor of the Heimanns and enter judgment in favor of Amoco consistent with this opinion.[13]

REVERSED and REMANDED.

---

**13.** Because we reverse the judgment of the district court, we need not consider the additional issues raised by Amoco on appeal or address the Heimanns' cross-appeal.